LAND, Justice.
 

 At the age of IS, plaintiff married defendant in the city of New Orleans on April 22, 1931. A little girl 18 months old is the only issue of the marriage.
 

 On January 30, 1934, plaintiff brought suit in the court below for separation from bed and board, and defendant, in reconvention, likewise claimed separation from bed and board, on alleged grounds of cruel treatment in each case.
 

 Judgment was rendered rejecting the main demand of plaintiff at her costs and dismissing the reconventional demand ■ of defendant at his costs.
 

 Plaintiff and defendant have both appealed from this judgment, and still insist here that their respective demands be granted.
 

 1. Because of the grave nature of the charges made by the wife and husband against each other, the case has reached such an acute stage, after more than a year of separation, that we are convinced that a reconciliation of the parties is not probable, or even possible.
 

 After careful review and due consideration of the evidence in the case, we are decidedly of the opinion that plaintiff should be granted a decree of separation from bed and board against defendant.
 

 Not only by her own testimony, but by the testimony of her brother, grandmother, and aunt, plaintiff has proved, to our satisfaction, that defendant beat and maltreated her; and that defendant, on one occasion, also beat and maltreated both plaintiff and her grandmother, after he had driven his wife from home, and while she was at the home of her grandmother.
 

 Defendant, of course, denied these charges on the witness stand, and has testified, as alleged in his reconventional demand, that he “has at all times been a kind and dutiful husband and has done everything within his power to make his marriage happy and comfortable,” the usual stereotyped formula adopted in such ca.ses.
 

 
 *635
 
 Like the original Adam, defendant, in order to shield himself, has laid the whole blame upon the woman.
 

 In his reconventional demand for separation, defendant has not charged his wife with adultery outright, for the plain reason that he was not able to prove a charge so grave, but he has attempted, under the pretext of cruel treatment, and by way of innuendo, to place a stigma upon her good name without adequate proof of guilt, and to place his wife in the “black li'st” of women of questionable chastity, and, by this subtle method of refined cruelty, has endeavored to humiliate her and to hold her up as an object of scorn and aversion.
 

 The evidence shows that defendant not only has a bad and violent temper, but that he belongs to the class of persons of inordinately jealous temperament, to whom “trifles light as air are confirmations as strong as proofs of Holy Writ.”
 

 The central figure in the imagined woes of defendant is one Barrow, the “ice-man” at the Polar Wave Ice House, across the street from defendant’s residence.
 

 Defendant’s particular grievance is found in his statement that, one night about 10 o’clock, he found his wife in a yellow cab with Barrow.
 

 Plaintiff indignantly denied this charge on the witness stand; and, although defendant had summoned Barrow as a witness in the case, he did not place the suspected Lothario on the witness stand to corroborate the charge made by defendant against his wife. The legal presumption therefore is that, if Barrow had been' called as a witness, he would not have testified in favor of defendant, whose charge against his wife had been bitterly denied by her.
 

 It is indeed remarkable that defendant should have waited to demand a separation from his wife by reconvention, if it be true that she was guilty, and defendant felt the humiliation and mortification which he testifies that her alleged misconduct had caused him. The tardiness of defendant in making the charge in itself arouses our suspicions both as to defendant’s sincerity in making it and also as to the truthfulness of the charge itself.
 

 In our opinion, defendant has failed to prove the accusation made by him against his wife.
 

 2. One of the devious methods employed by defendant in this case was the introduction in evidence of a telegram sent by the Western Union Telegraph Company. This telegram was received by telephone, is dated New Orleans, La., December 25, A. M. 9:13, and reads as follows:
 

 “Don G. Barrow
 

 “Care J. L. Barrow Pelahatchie Miss.
 

 “Merry Christmas Don Hurry Home I Miss You Love
 

 “[Signed] Just Me.”
 

 Under “Subscriber’s Name,” in the left lower corner of the telegram, is the notation: “Do Not Give Sdrs Name”; and in
 
 *637
 
 the right lower corner under “Sender’s Name” is the notation: “Send Bill to Mrs. 7.
 
 C.
 
 Centanni
 
 7822
 
 Colipissa Street.” (Italics ours.)
 

 The bill for the telegram, dated February 2, 1934, for 38 cents, is addressed to “Mrs. 7.
 
 C.
 
 Centanni,
 
 7822
 
 Colipissa Street, City.”
 

 Plaintiff, Mrs. Florence Perry Centanni, is the wife, not of
 
 J. C.
 
 Centanni, but of the defendant,
 
 Jerome R.
 
 Centanni, and her initials are “Mrs.
 
 J. R.
 
 Centanni,” and not “Mrs. 7.
 
 C.
 
 Centanni”; besides, plaintiff resided at
 
 7820
 
 Colapissa Street, and not at
 
 7822
 
 Colapissa street.
 

 Mrs. Pete Ferrara, defendant’s chief witness, resides at
 
 7822
 
 Colapissa street.
 

 She testified that she received this bill; that she had sent some long-distance messages over Mrs. J.
 
 R.
 
 Centanni’s telephone; and that she knew Barrow, “because he worked across the street from where I live.”
 

 The directions on the bill are that it was to be sent to the residence number of this witness,
 
 7822
 
 Colapissa street. She was asked on the witness stand if her husband was not a first or second cousin of defendant, and her answer was: “I won’t say that he is or is not, because I don’t know that.”
 

 Mrs. J. R. Centanni, 7820 Colapissa street, denies positively that she sent the telegram to Barrow or that she had any connection with it or knew anything about it.
 

 There is no evidence to show that the. bill was ever charged to the telephone number of Mrs. J. R. Centanni, 7820 Colapissa street, or that she ever had -this bill in her possession at any time, or that she was ever called upon to pay the bill, or that she ever promised to do so. •
 

 Indeed, it is testified to by Mr. Shaw, the manager’s clerk of the Western Union Telegraph Company, that no telephone number was given at all by the party who telephoned the message, but that directions were given to send the bill to “Mrs. 7.
 
 C.
 
 Centanni,
 
 7822
 
 Colipissa Street.”
 

 Mrs. Ferrara.testifies that the messages that she sent over Mrs. 7.
 
 R.
 
 Centanni’s phone were “to Bogalusa in case of my uncle’s death”; but no such messages, or copies of same, were produced from the office of the Western Union Telegraph Company on the trial of the case to corroborate her testimony.
 

 She states also that she knew that the number of Mrs. 7.
 
 R.
 
 Centanni’s residence-was
 
 7820
 
 Colapissa street. She then is bound to have known that “Mrs. 7.
 
 C.
 
 Centanni,
 
 7822
 
 Colipissa Street,” was not Mrs.
 
 J. R.
 
 Centanni, 7820 Colapissa street; and her statement that, as soon as she opened the bill for the telegram,
 
 she knew
 
 that it was for “Mrs. 7.
 
 R.
 
 Centanni, 7820 Colapissa Street,” is purely gratuitous. Her further statement that, when she handed the bill over her back fence to Mrs. J. R. Centanni, she told the witness that “she-did not want her husband to see
 
 *639
 
 this telegram, because she had sent it to Don Barrow when he went home to visit his mother Christmas,” is flatly contradicted by Mrs. J. R. Centanni, who denies any knowledge of or connection with, the telegram.
 

 It is not pretended by Mrs. Ferrara that Mrs. J. R. Centanni had ever seen her before the telegram was sent, and that she had told her, when she received the bill, to keep it a secret and turn the bill over to plaintiff. There is no evidence whatever that such confidential relations ever existed between Mrs. J. R. Centanni and the witness, and it is not reasonably to be presumed that plaintiff would send a telegram of such private character and would have the bill for same placed in the hands of her next door neighbor, who is apparently unfriendly, if she did not want her husband to know anything about it.
 

 The close relationship of defendant with the Ferraras is clearly indicated by the conduct of Mrs. Ferrara and also by her testimony. The bill for the telegram had been sent to her residence, under directions received in a female voice over the telephone by the Western Union Telegraph Company, and the duty devolved upon her to explain this circumstance, and she has attempted to do so by incriminating plaintiff, who denies the charge, and no innocent person could have done more.
 

 The defendant has been contradicted by four witnesses in his denial of the charge of beating his wife and her grandmother, and Mrs. Ferrara, his chief witness, is contradicted by plaintiff, and the testimony of Mrs. Ferrara as to the telegram is not otherwise corroborated. Nor was Barrow, although summoned as a witness by defendant, placed on the stand to testify in reference to this telegram.
 

 We decline, therefore, to place a stigma upon the good name of plaintiff, as a wife and a mother, upon testimony of such doubtful character.
 

 3. Defendant also vainly attempted to show that plaintiff had made a present to Barrow by introducing in evidence an account sent to plaintiff by Miller Bros., “Square Deal Jewellers,” of the city of New Orleans. This account, unlike the telegram, is properly addressed to “Mrs. Jerome Centanni, 7820 Colapissa Street, ■City,” and shows a balance due of $3 on an $8 purchase.
 

 There is not one scintilla of evidence in the record to show that plaintiff purchased a present from Miller Bros, for Barrow. On the contrary, plaintiff’s uncontradicted testimony is that she purchased from that firm a cigarette case and lighter for her “kid” brother.
 

 Defendant again failed to place his witness, Barrow, on the witness stand to contradict plaintiff.
 

 We have come to the conclusion, from a consideration of all of the facts of the case, that the ill treatment of plaintiff by defendant has been of such a nature as to render their living together insupportable.
 
 *641
 
 and that plaintiff is justly entitled to a decree of separation from bed and board against defendant, and to a dissolution, liquidation, and settlement 'of the community existing between them.
 

 It is therefore ordered that the judgment appealed from be annulled and reversed.
 

 It is now ordered that there be judgment in favor of plaintiff, Mrs. Florence Perry Centanni, and against ' defendant, i Jerome R. Centanni, granting to plaintiff a separation a mensa et thoro; that a notary public be appointed to make an inventory of the property belonging to the community existing between plaintiff and defendant; that the community of acquets and gains existing between the parties be dissolved, liquidated, and settled according to law; that plaintiff be granted the care, custody, and control of the minor child, Eloise Elaine; and that defendant pay all costs.